UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
JERRY L. VAUGHN, et al.,

                          Plaintiffs,

             -against-

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,
DUANE E. WOERTH, as President of Air Line Pilots
Association, International, US AIRWAYS, INC.,
US AIRWAYS GROUP, INC., RETIREMENT
SYSTEMS OF ALABAMA, and RETIREMENT
SYSTEMS OF ALABAMA HOLDINGS LLC,

                         Defendants.
---------------------------------------------------------------------X

**MEMORANDUM and ORDER**

03-CV-4822 (SLT)(SMG)

**TOWNES, United States District Judge:**

     This case arises from the recent dire financial quagmire of US Airways, Inc. ("US

Airways").  Since 2002, US Airways has filed for bankruptcy protection on two separate

occasions, and has been in constant financial turmoil.  During the first reorganization, begun in

August 2002, the United States Bankruptcy Court for the Eastern District of Virginia approved

the termination of US Airways' then-effective pilot pension plan, a defined benefit plan, and the

implementation of a replacement defined contribution plan.  US Airways once again filed for

bankruptcy protection in September 2004, and during this second reorganization, the defined

contribution plan was modified to ensure the company avoided liquidation.  With each change to

the pilot pension plan, pilots were promised significantly fewer retirement benefits, which has

led to the instant action.

     Plaintiffs, who number nearly 300 individuals, are pilots presently or formerly employed

by US Airways and US Airways Group, Inc. (collectively, "US Airways") who have either

reached their sixtieth birthday or are close to doing so.[1]  Some of the plaintiffs have already

retired, but they remain involved in this dispute because of significant losses to their pension

plans.  They commenced this action against defendants US Airways, Air Line Pilots Association,

International ("ALPA"), Duane Woerth, as President of ALPA, Retirement Systems of Alabama

("RSA"), and Retirement Systems of Alabama Holdings LLC ("RSA Holdings").  Through the

Fourth Amended and Supplemental Complaint (the "FAC"), plaintiffs assert several claims

against defendants:  (1) that ALPA and Woerth allegedly breached their duty of fair

representation, engaged in discrimination based upon age in violation of the Age Discrimination

in Employment Act ("ADEA"), and violated the Racketeering Influenced and Corrupt

Organizations Act ("RICO"); (2) that US Airways discriminated against plaintiffs based upon

age in violation of  the ADEA, breached its fiduciary duties and conducted "prohibited

transactions" under the Employment Retirement Income Security Act ("ERISA"), and violated

RICO; and (3) that RSA and RSA Holdings violated RICO.

On or about November 22, 2006, plaintiffs voluntarily dismissed all of their claims

against US Airways, and now ALPA and Woerth (collectively, "ALPA") and  RSA and RSA

Holdings (collectively, "RSA") separately move to dismiss the FAC.  For the reasons set forth

below, both ALPA's and RSA's motions are granted.

---

[1]  Pursuant to Federal Aviation Regulations, commercial pilots, upon reaching the age of sixty,
can no longer serve as pilots-in-command or as first officer.  *See* 14 CFR § 121.383(c).  As a result, most
pilots choose to retire at the age of sixty, effectively rendering the directive a mandatory retirement rule.

# BACKGROUND[2]

## A.    *US Airways' Financial Problems and the First Concession*

In 2001, US Airways was the seventh largest airline in the United States and employed

nearly 49,000 active employees, including 6,200 pilots.  Following corporate moves that

decreased its stock price, including an approximately $1.9 billion stock buyback, and the

terrorist attacks of September 11, 2001, US Airways began experiencing significant financial

problems.  US Airways' financial predicament was exacerbated by the company's significant

underfunding of its employees' four pension plans.  In February 2002, US Airways reported that

the pilots' pension plan, a defined benefit plan (the "DB Plan") – which was the costliest of the

four pension plans – was only funded at 64% of the required level, which obligated US Airways

to immediately and significantly contribute to the DB Plan.[3]  In March 2002, David Siegel was

---

[2]  For the purpose of these motions to dismiss, the following facts are drawn from the FAC, and are accepted as true.  *See Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir. 2001).  In addition to the FAC, the Court will consider several other documents that have been provided with the parties' motion papers because they are explicitly referenced in the FAC, incorporated by reference, or within the purview of judicial notice, which include the transcript and decisions of the Bankruptcy Court in connection with the termination of the pilots' defined benefit plan, *see In re US Airways Group, Inc.,* 296 B.R. 737 (Bankr. E.D.Va. 2003), the terms of each iteration of the pilots' pension plan, certain communications from ALPA to its members, and an undated letter from US Airways' CEO to ALPA members.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (noting that although a court deciding a Rule 12(b)(6) motion "is normally required to look only to the allegations on the face of the complaint . . . [d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.") (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999)).

[3]  As noted in plaintiffs' "Memorandum of Law in Opposition to [ALPA's] Motion to Dismiss" ("Opp. to ALPA"), "Pursuant to ERISA guidelines, the DB Plan was required to have sufficient funding to pay benefits to a minimum of eighty percent of the promised benefits.  If the DB Plan's funding dropped below eighty percent, US Airways was required to make deficit reduction contributions to rapidly return the DB Plan funding level to ninety percent."  Opp. to ALPA, p. 2 (citing 29 U.S.C. §§ 1082, 1083).

appointed president and CEO of US Airways.  Soon thereafter, the company publicly announced that its financial position required immediate improvement.

Claiming that employee concessions were necessary to stave off bankruptcy, in mid-2002, prior to filing its first petition for bankruptcy protection, US Airways sought substantial cuts to employee wages and benefits from all of the unions representing its employees.  ALPA, the pilots' exclusive negotiating agent, was the only employee union to agree to the substantial cuts at that time, but did not negotiate to have the savings earmarked to correct the DB Plan's funding deficit (the "First Concession").[4]  The other unions eventually agreed to the substantial cuts requested by US Airways approximately one month after the company filed its first petition for bankruptcy protection.

In August 2002, shortly before US Airways filed for bankruptcy protection, it managed to obtain tentative approval of a $1 billion loan package guaranteed by the Air Transportation Stabilization Board ("ATSB").  The ATSB loan guarantee, however, was conditioned on US Airways demonstrating that it could achieve certain revenue and cost reduction targets in accordance with a seven-year business plan.

**B.      US Airways' First Bankruptcy and Termination of the DB Plan**

On or about August 11, 2002, US Airways filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "2002 Bankruptcy").  To maintain its cash liquidity during the

---

[4]  As noted by Bankruptcy Judge Stephen Mitchell, in *In re US Airways Group*, this "first round" of concessions did not explicitly modify the terms of the pilots' pension plan.  296 B.R. at 737.  However, since the amount of each pilot's pension was calculated based upon that pilot's "age, years of service, and final average earnings," the salary reductions in the First Concession had the "incidental effect of somewhat reducing the future obligations [of US Airways] under the plan." *Id.*

reorganization, as the ATSB guarantee was substantially a form of exit financing, US Airways obtained $500 million from RSA through a debtor-in-possession loan. RSA also agreed to become a "plan sponsor," whereby it agreed to invest $240 million in US Airways once it exited bankruptcy in exchange for a 37% interest in the company. RSA's investments enabled US Airways to pursue a "fast track" reorganization and to emerge from Chapter 11 during the first quarter of the next year.

However, two substantial problems arose during the bankruptcy case that threatened the business plan upon which the ATSB-guaranteed loan and RSA investments were conditioned. First, US Airways determined that it could not meet the revenue targets outlined in the business plan because of reduced passenger revenue and increased fuel costs. Although US Airways agreed during the First Concession not to seek any additional relief regarding its obligations to the pilots pursuant to any provision in the Bankruptcy Code – which the pilots understood to mean that US Airways would not seek *any* additional concessions from them – US Airways attempted to negotiate further with ALPA. In December 2002, US Airways and ALPA engaged in a second round of negotiations to further reduce pilot wages and benefits. At the conclusion of these negotiations, ALPA agreed to a significant amount in annual wage and benefits concessions, including modifications to the DB Plan (the "Second Concession"). These concessions were memorialized in two documents referred to as Letter of Agreement ("LOA") No. 83 and LOA No. 84.

During the Second Concession's negotiations, ALPA did not audit the DB Plan to determine the accuracy of US Airways' statements regarding the financial health of the DB Plan despite having the express power to do so pursuant to LOA No. 9. When confronted by its

members regarding this failure, ALPA erroneously stated that it could not compel the company to disclose the financial condition of the DB Plan. ALPA eventually hired an actuarial firm to perform an audit of the DB Plan, but this analysis – which confirmed the accuracy of US Airways' calculations – was not reported until after the Bankruptcy Court had approved the DB Plan's termination. Another concern for ALPA's members during this time was the fact that ALPA was the only employee union to agree to the full amount of US Airways' requested concessions.

The Second Concession, however, did not address the second problem threatening US Airways' business plan – a serious funding shortfall for the company's four defined benefit plans, including the pilots' plan, over the seven-year period of the business plan. This shortfall was the result of both poor stock market performance that reduced the value of plan assets and historically-low interest rates that increased the plan's liabilities. Under the terms of the DB Plan, US Airways was obligated to regularly contribute funds to ensure that each pilot would receive his or her guaranteed benefit upon retirement. Although the contributed funds were invested and subject to gains and losses, each pilot's promised benefits remained constant, and US Airways was responsible for ensuring that each pilot's pension was sufficiently funded. Given the significant funding deficit, US Airways' responsibility to maintain a specific funding level for the DB Plan had substantially increased.

Both US Airways and ALPA attempted to find a solution to the shortfall in the DB Plan, which was projected to be nearly $1.7 billion during the term of US Airways' seven-year business plan. They pursued various solutions – including petitioning for funding waivers from the Internal Revenue Service ("IRS"); requesting restoration funding from the Pension Benefit

Guaranty Corporation ("PBGC"); and seeking Congressional legislation that would provide funding relief – but each of these efforts failed. Given the failure of these solutions, the DB Plan's termination appeared imminent.

In December 2002, around the same time US Airways and ALPA negotiated the Second Concession, they also conducted confidential negotiations. These negotiations produced an agreement in which US Airways agreed to negotiate and create a follow-up pension plan if the varied funding solutions failed and caused the DB Plan to be terminated (the "Side Letter Agreement"). The Side Letter Agreement was meant to remain confidential if and until the DB Plan was terminated, but ALPA's members soon learned of the agreement and questioned whether the agreement represented ALPA's consent to the DB Plan's termination. ALPA, in defending its decision to enter into the Side Letter Agreement, stated that the agreement was intended to provide the pilots with protection in the event that the DB Plan was terminated, and did not constitute consent to the plan's termination.[5]

On or about January 30, 2003, US Airways sent to ALPA members and the PBGC a sixty-day notice of its intention to terminate the DB Plan, and also moved the Bankruptcy Court to terminate the DB Plan under the "distress termination" provisions of ERISA. The PBGC, the entity responsible for paying the insured benefits under the terminated plan, neither supported nor opposed the DB Plan's termination. ALPA opposed the motion, primarily arguing that such a termination would violate the collective bargaining agreement that required US Airways to maintain the DB Plan. After a four-day hearing on US Airways' motion, on March 1, 2003,

---

[5] The chairman of ALPA's negotiating committee even testified during the 2002 Bankruptcy that "the reference in the side letter to [the DB Plan's] 'termination' was intended to address the possibility of an involuntary termination by the PBGC and was not intended by ALPA as consent for [US Airways] to initiate a distress termination." *In re US Airways Group*, 296 B.R. at 739.

Bankruptcy Judge Mitchell ruled from the bench that US Airways met the requirements for a distress termination, and allowed it to terminate the DB Plan. On March 7, 2003, the Bankruptcy Court issued a Memorandum Opinion both memorializing that decision, and explaining that US Airways' ability to meet the conditions outlined in the ATSB-guaranteed loan was dependent upon resolving the DB Plan's funding deficit. *See In re US Airways Group, Inc.*, 296 B.R. 737. According to the Bankruptcy Court, the DB Plan had to be terminated because there were no other realistic options for resolving the funding deficit. The Bankruptcy Court also ruled that it was not deciding whether the DB Plan's termination violated the collective bargaining agreement between US Airways and ALPA because that issue could only be determined through the dispute mechanisms established by the Railway Labor Act, 45 U.S.C. § 151, *et seq*.

Prior to the Bankruptcy Court's oral decision approving the DB Plan's termination, ALPA refused to negotiate the creation of a follow-up pension plan, and instead sought to save the DB Plan, which the union repeatedly led its members to believe could be saved. Contradistinctively, following the Bankruptcy Court's decision, ALPA and US Airways began negotiating the termination of the DB Plan and the creation of a follow-up pension plan. During these negotiations, a number of ALPA's members received two separate letters from two union officials assuring the pilots that they would have an opportunity to ratify or reject proposals to terminate the DB Plan and implement a replacement plan. On March 22, 2003, without any membership vote, US Airways and ALPA agreed to implement a defined contribution plan ("DC Plan I") to replace the terminated DB Plan. The agreement creating DC Plan I was memorialized in LOA No. 85, and approved by the Bankruptcy Court on March 28, 2003. Three days later, on March 31, 2003, US Airways emerged from bankruptcy.

The new pilot pension plan, DC Plan I – in contrast to the original DB Plan – required US Airways to make promised contributions to the plan based upon each pilot's unique contribution rate, but the company was not obligated to ensure that the plan maintained a sufficient level of assets so that each pilot would receive a guaranteed amount of money upon retirement. The company's contribution rate for each pilot was calculated through a complex formula designed to help pilots achieve a target benefit upon retirement.[6] In large part, the target benefit was calculated by projecting a pilot's earnings during the end of his or her career less the projected amount of annuities from the PBGC. Under DC Plan I, US Airways was required to provide greater contributions to pilots approaching the mandatory retirement age of 60 than to younger pilots who had a longer time period in which to accumulate contributions and achieve their target benefits. The higher contributions, however, were limited to 100% of a pilot's salary, with the result that older pilots were still unlikely to achieve their target benefits upon retirement.[7] Both US Airways and the PBGC indicated a willingness to correct the inequities that would affect pilots close to retirement age, but ALPA did not renegotiate any portion of DC Plan I. ALPA's members nearing retirement were further dissatisfied with ALPA's actions when they later learned from an investment document associated with DC Plan I that the union was to serve as a manager of the funds contributed to DC Plan I.

---

[6] According to the FAC, a pilot's contribution rate is determined by "the percentage of projected pay necessary to be contributed monthly to that pilot's DC Plan balance such that, with earnings assumed at eight percent, the balance at age 60 is equal to that pilot's [target benefit upon retirement]." FAC ¶ 427.

[7] The FAC also alleges that, under DC Plan I, older pilots would receive significant amounts of their contributions in a "non-qualified plan" that would subject their pensions to immediate taxation whereas younger pilots would receive most of their contributions in a "qualified plan" that would enable them to delay the taxation of their pensions. FAC ¶¶ 462-63.

*C.*      *US Airways' Second Bankruptcy and Modifications to DC Plan I*

Despite the substantial cost-saving measures achieved immediately before and during US Airways' first bankruptcy, the company soon found itself again facing serious financial difficulties. On or about September 12, 2004, US Airways filed its second petition for bankruptcy protection under Chapter 11 (the "2004 Bankruptcy"), in the Eastern District of Virginia. During the second reorganization, ALPA and US Airways agreed to further reduce costs associated with the pilot's pension plan by amending DC Plan I. The amended plan ("DC Plan II") eliminated the target benefit concept and instead required US Airways to make contributions to each pilot's individual account at the same rate – at 10% of the pilot's salary – regardless of age, seniority, or any other factor. Under DC Plan II, however, pilots nearing retirement age had less time to accumulate contributions and would likely receive fewer benefits upon retirement than younger pilots.

On or about January 11, 2005, several pilots received a Summary Annual Report regarding the funding levels of the original DB Plan for the year 2002 which was attached to the 2003 Summary Annual Report. The report revealed that the DB Plan, as of December 31, 2002, was funded to the ERISA minimum, which directly conflicted with numerous statements made by US Airways and ALPA regarding the DB Plan's severe underfunding. In addition, the report was provided outside the ERISA-required time frame for publishing the status of pension plans, and it was not provided to every plan participant. The FAC fails to indicate whether, and to what extent, these issues were raised with ALPA or during US Airways' 2004 Bankruptcy. In July 2005, US Airways' second reorganization plan was confirmed by the Bankruptcy Court.

*D.*      *Commencement of This Action*

On September 22, 2003, a number of current and retired pilots commenced this action against ALPA and various ALPA officials.[8]  The initial complaint alleged only that ALPA violated the duty of fair representation ("DFR") because of the manner in which it negotiated the termination of the DB Plan and created DC Plan I.  Subsequently, plaintiffs filed three more versions of the complaint before filing, on June 22, 2006, the current version of their complaint, the FAC, which consumes nearly 100 pages and over 700 paragraphs.  With each amendment to the complaint, plaintiffs made various changes, such as adding more plaintiffs, removing the ALPA officials as defendants (with the exception of Woerth), naming new defendants (*i.e.*, US Airways and RSA), and asserting new claims under the ADEA, ERISA, and RICO.  However, the FAC is essentially the same as the immediately-preceding complaint, with a DFR claim against ALPA; ADEA claims against ALPA and US Airways; and RICO claims – which were first raised in the immediately-preceding complaint – against ALPA, US Airways, and RSA. The only substantive change is that plaintiffs have asserted a new ADEA claim against ALPA and US Airways, arising from the creation of DC Plan II.

---

[8]  Prior to this action, there have been have at least two other cases arising from the actions taken against pilots' pension plans during US Airways' two bankruptcy proceedings – both of which have since been dismissed.  The first involved a group of pilots, known as the "Soaring Eagles," appealing the Bankruptcy Court's approval of the DB Plan's termination to the district court, and then to the Fourth Circuit.  *See In re US Airways Group, Inc.*, 369 F.3d 806 (4th Cir. 2004).  The Fourth Circuit affirmed the district court's holding that the plaintiffs' claims were equitably moot since the DB Plan had already been terminated; DC Plan I had already been implemented; and, in reliance upon these actions, many other financial arrangements had been executed.  *Id.*

The second action was brought by another group of pilots – some of whom have since been added to this action – in which the plaintiffs alleged many of the same claims raised herein.  *See Popper, et al. v. Air Line Pilots Ass'n, Int'l, et al.*, No. 03-CV-3408 (E.D.N.Y. *filed* July 11, 2003) (Bianco, J.).  After initially moving to consolidate the *Popper* action with this action, on March 3, 2006, the plaintiffs and the remaining defendants, which only included US Airways at that time, filed a stipulation of dismissal that was "so ordered" on March 9, 2006.

On August 11, 2006, the Court held a pre-motion conference regarding ALPA's and RSA's proposed motions to dismiss, during which separate briefing schedules for the respective motions were set. Due to differing briefing schedules and delay caused by plaintiffs' decision to change counsel, RSA's motion was filed on November 6, 2006, and ALPA's motion was not filed until May 31, 2007. On November 24, 2006, plaintiffs voluntarily dismissed all of their claims against US Airways. Thereafter, on January 4, 2008, the Court held argument on both of defendants' motions.[9]

## DISCUSSION

### A.      *Rule 12(b)(6) Legal Standard*

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all of the factual allegations in the complaint as true and must draw all reasonable inferences in the plaintiff's favor. *See Erickson v. Pardus*, --- U.S. ----, 127 S.Ct. 2197, 2200 (2007); *Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006). At this stage, "[t]he Court's task is 'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 623 (S.D.N.Y. 2007) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). In conducting this inquiry, the Court must determine whether plaintiffs have stated "enough facts to

---

[9] Shortly after the Court held argument, counsel for plaintiffs filed an unsolicited letter supplementing and clarifying plaintiffs' positions at oral argument. Thereafter, counsel for ALPA filed a letter requesting that plaintiffs' letter be stricken, and addressing the arguments raised in plaintiffs' letter. Given that these submissions were filed without leave of Court, and counsel for all parties were provided ample opportunity to establish their respective positions at oral argument, the Court will not consider these supplemental submissions. *See Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 369-70 (S.D.N.Y. 1997).

state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1974 (2007).

While a complaint "does not need detailed factual allegations," *id.* at 1964, it nonetheless must give the defendant(s) "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 127 S.Ct. at 2200. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) (holding that bald assertions and conclusions of law are inadequate to survive a motion to dismiss). As the Second Circuit recently stated, the "flexible 'plausibility standard'" enunciated in *Bell Atlantic* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

As aforementioned, this Court will consider documents outside the complaint that may properly be considered in connection with a motion under Rule 12(b)(6), *see Roth*, 489 F.3d at 509; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), and "[i]f these documents contradict the allegations of the [FAC], the documents control and this Court need not accept as true the allegations in the [FAC]." *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). However, "the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth*, 489 F.3d at 510 (quoting *Bell Atlantic*, 127 S.Ct. at 1969).

**B.**     *ALPA's Motion to Dismiss*

ALPA moves to dismiss all three claims asserted against it: (1) the DFR claims; (2) the

ADEA claims; and (3) the RICO claims.  As set forth below, ALPA's motion is granted in its

entirety.

**1.**     *Plaintiffs' Duty of Fair Representation Claims*

It is well established that a union "has a duty to represent fairly all employees subject to

the collective bargaining agreement."  *Spellacy v. Airline Pilots Ass'n Int'l*, 156 F.3d 120, 126

(2d Cir. 1998) (citing *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 74 (1991)), *cert. denied*, 526

U.S. 1017 (1999).  "Under this doctrine, the exclusive agent's statutory authority [under the

National Labor Relations Act] to represent all members of a designated unit includes a statutory

obligation to serve the interests of all members without hostility or discrimination toward any,

and to exercise its discretion with complete good faith and honesty, and to avoid arbitrary

conduct."  *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372 (1990)

(quoting *Vaca v. Sipes,* 386 U.S. 171, 177 (1967)).  The Supreme Court has described the duty of

fair representation as "akin to the duty owed by other fiduciaries to their beneficiaries."  *O'Neill,*

499 U.S. at 78.  Although courts are permitted to review union conduct, they must not substitute

their own view for that of the union, and they "must be highly deferential, recognizing the wide

latitude that [unions] need for the effective performance of their bargaining responsibilities."  *Id.*

To prove that a union has breached its duty of fair representation, the challenging

members must establish two elements.  First, they must prove that the union's actions or

inactions "are either 'arbitrary, discriminatory, or in bad faith.'"  *O'Neill,* 499 U.S. at 67; *see*

*also Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998).  A union's actions are

"arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *O'Neill,* 499 U.S. at 67 (internal citation and quotation marks omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45-46. Moreover, "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989). A union's acts are discriminatory if they are "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971); *see also Blossomgame v. New York's Health and Human Serv. Union*, No. CV 02-1594, 2004 WL 2030285, at *8 (E.D.N.Y. Sept. 10, 2004). Bad faith, which "encompasses fraud, dishonesty, and other intentionally misleading conduct," requires proof that the union acted with "an improper intent, purpose, or motive." *Spellacy*, 156 F.3d at 126 (internal citations omitted). Second, the challenging members must also "demonstrate a causal connection between the union's wrongful conduct and their injuries." *Id.*; *see also Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 472-73 (2d Cir. 1999).

Here, the FAC, through Counts I, II, and III, alleges that ALPA's actions and inactions were arbitrary, discriminatory, and in bad faith. Count I of the FAC alleges that ALPA failed to audit the DB Plan prior to its termination and intentionally misrepresented its authority to compel an audit of the DB Plan when its members inquired. Count II alleges that ALPA reneged on its promise to permit members to vote on the possibility of terminating the DB Plan and implementing a new plan before any such action would be taken. Lastly, Count III alleges that

ALPA discriminated against plaintiffs by agreeing to DC Plan I after the DB Plan was

terminated and failed to negotiate for a non-discriminatory plan. ALPA argues that its alleged

conduct fails to fit any of the categories for a properly-pled DFR claim, and plaintiffs' DFR

claims should be dismissed. ALPA raises various theories for dismissing each Count of

plaintiffs' DFR claims, which the Court will now examine.

### a.      *DFR Claims in Count I*

In arguing that Count I should be dismissed, ALPA spends the entirety of its moving

memorandum of law addressing a minor allegation in Count I, and addressing the major

allegations of Count I in its reply. The thrust of Count I is that ALPA intentionally

misrepresented its authority to scrutinize the financial health of the DB Plan and, for unexplained

reasons, failed to conduct an audit until *after* negotiating the First Concession, the Second

Concession, and the DB Plan's termination. However, ALPA devotes much of its argument

seeking dismissal of Count I by characterizing it as alleging that ALPA contested the DB Plan's

termination too long, thereby losing valuable time in negotiating adequate terms for DC Plan I.

The inartfully drafted FAC includes language suggesting that ALPA did not forego its

opposition to the DB Plan's termination within enough time to negotiate an adequate follow-up

plan. The Court, however, reads Count I as a challenge to the arbitrary or deliberately

misleading nature of ALPA's failure to perform an audit.

In construing Count I solely as a challenge to ALPA's delay in negotiating DC Plan I,

ALPA raises two arguments for its dismissal. It argues that (1) plaintiffs' pleadings fail to

sufficiently demonstrate that ALPA's actions caused any injuries because the allegations in

Count I incorrectly assume that DC Plan I treated plaintiffs unfairly; and (2) plaintiffs are

attempting to second-guess ALPA's negotiating strategy, which is not a basis for a properly-pled DFR claim. Both theories of dismissal have merit. First, the factual allegations in the FAC demonstrate that older pilots were treated more favorably than younger pilots because DC Plan I required US Airways to contribute more to older pilots' retirement accounts than to the accounts of younger pilots. Given the favorable nature of DC Plan I, as the FAC explicitly alleges, plaintiffs' allegations faulting ALPA for failing to negotiate better terms is insufficient to assert a claim for breaching the duty of fair representation. *See, e.g.*, *Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231, 243-44 (E.D.N.Y. 2003) (citing cases).

Second, ALPA argues that its strategic decision to oppose the DB Plan's termination as long as possible to create some negotiating leverage in the event that it had to negotiate the terms of a follow-up pension plan cannot be the proper subject of a DFR claim. To the extent that Count I challenges the rationality of ALPA's continued opposition to the DB Plan's termination, it fails to sufficiently raise a proper DFR claim because ALPA's tactical decisions, whether ultimately wise or not, are entitled to deference. *See Nicholls v. Brookdale Univ. Hosp. and Med. Ctr.*, No. 05-CV-2666, 2005 WL 1661093, at *11-*12 (E.D.N.Y. July 14, 2005), *aff'd*, 204 Fed. Appx. 40, 42 (2d Cir. Oct. 18, 2006); *see also O'Neill,* 499 U.S. at 78-79 (holding that union's decision to enter into strike settlement agreement was not arbitrary since it was supported by rational reasons even though the settlement imposed terms that turned out to be worse for union members than if there was no settlement); *Kavowras v. New York Times Co.*, No. 00 Civ. 5666, 2004 WL 1672473, at *7 (S.D.N.Y. July 26, 2004) ("the Union's decision to pursue arbitration in lieu of litigation is best categorized as strategic in nature and cannot support [plaintiff's] breach of the duty of fair representation claim."), *aff'd*, 132 Fed. Appx. 381 (2d Cir.

May 24, 2005).  Given this deference, plaintiffs' allegations fail to assert a "plausible" duty of fair representation claim.  *Iqbal*, 490 F.3d at 157-58; *see also Nicholls*, 2005 WL 1661093, at *7 (in granting the defendants' motion to dismiss, noting the "enormous burden on plaintiff to establish that a union breached its duty of fair representation").

Count I alleges that ALPA deliberately failed to examine the DB Plan's financial state before agreeing to each of US Airways' requested concessions, including the termination of the DB Plan, and it intentionally misrepresented its authority to conduct an audit of the DB Plan.  In addressing these allegations, ALPA also argues that it made a strategic decision that cannot be second-guessed.  The Court agrees.  Given the deference afforded ALPA in carrying out its duties under the collective bargaining agreement, *see O'Neill*, 499 U.S. at 78, the allegations in the FAC fail to sufficiently support the conclusion that ALPA's failure to conduct an audit of the DB Plan was so unreasonable as to constitute an action outside the requisite rationality.  *See Moore v. Roadway Express, Inc. and Local 707*, No. 07-CV-977, 2008 WL 819049, at *6-*7 (E.D.N.Y. Mar. 25, 2008) (dismissing, on a motion to dismiss, plaintiff's duty of fair representation claim for failing to "allege any facts that elevate [the] allegations above the level of mere speculation."); *see also Marquez*, 525 U.S. at 46 ("A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation."); *Spellacy*, 156 F.3d at 127 ("To uphold the union's action . . . it is not necessary that we find on the merits that such an interpretation was correct.") (internal citations and quotation marks omitted).  Although plaintiffs argue that ALPA's decision to audit the DB Plan after it had been terminated "is almost an admission of its irrational behavior," Opp. to ALPA, p. 11, plaintiffs have alleged nothing more to support their claim.  Without more, ALPA's after-the-fact audit

demonstrates that it made an error, or even acted negligently, in failing to conduct an audit of the DB Plan prior to agreeing to the concessions on its members' behalf, which is insufficient to prove that ALPA breached its duty of fair representation. *See Marquez*, 525 U.S. at 46; *Rawson*, 495 U.S. at 372-73 ("mere negligence . . . [does] not state a claim for breach of the duty of fair representation"); *Nicholls*, 204 Fed. Appx. at 42 (affirming lower court's grant of defendants' motion to dismiss, noting that "the Union may have committed a tactical (or even a negligent) error, [but] such an error, even if established, does not constitute a breach of the Union's duty."); *see also Iqbal*, 490 F.3d at 157-58 (holding that a claim must be supported by sufficient factual allegations to "render the claim *plausible.*"). Accordingly, the Court finds that the allegations in Count I are insufficient to adequately support the claim that ALPA breached its duty of fair representation.[10]

### b.      DFR Claims in Count II

In seeking dismissal of Count II – which alleges that ALPA reneged on its promise to allow members to ratify the termination of the DB Plan and the implementation a new follow-up plan – ALPA raises various arguments, only one of which is fatal to plaintiffs' claim and merits discussion here. ALPA argues that its failure to go through with the membership vote did not cause any harm to plaintiffs, and plaintiffs' claims should be dismissed for lack of causation. Although plaintiffs largely ignore this argument in opposing ALPA's motion to dismiss, the FAC alleges that the unfulfilled promise of a membership vote caused a series of events that led

---

[10]  The FAC also alleges that ALPA acted in bad faith by intentionally misrepresenting that it had no authority to conduct an audit despite clear authority to do so. Other than plaintiffs' bare allegation, the FAC does not suggest, let alone allege, that there is "substantial evidence of fraud, deceitful action, or dishonest conduct" by ALPA. *Lockridge*, 403 U.S. at 299 (internal citation and question marks omitted). Accordingly, this aspect of Count I is also dismissed.

to the DB Plan's termination and the implementation of DC Plan I.  Simply stated, the FAC

alleges that the promise of a vote caused plaintiffs to subdue their pressure on ALPA to take

certain actions, especially with regard to formulating the terms of DC Plan I, and caused ALPA

to forego grievances and appeals of the DB Plan's termination.  These allegations are simply

insufficient to establish a causal connection between ALPA's alleged misrepresentation of a

membership vote and plaintiffs' alleged injuries.  *See Sim*, 166 F.3d at 472-73; *Spellacy*, 156

F.3d at 126.  In fact, given ALPA's wide latitude in negotiating the DB Plan's termination and

DC Plan I's implementation, and that ALPA was under no obligation to accede to its members'

preferences even if a vote had taken place, *see White v. White Rose Food*, 237 F.3d 174, 182 (2d

Cir. 2001), there is no reasonable basis to believe that a membership vote would have saved the

DB Plan or altered the terms of DC Plan I.  Accordingly, Count II of the FAC must be dismissed.

### c.      *DFR Claims in Count III*

The third, and final, claim of plaintiff's DFR claims is Count III, which alleges that

ALPA discriminated against plaintiffs by agreeing to the terms of DC Plan I.  ALPA argues that

this claim is completely unsupported, and should be dismissed.  The Court agrees.  As discussed

above, ALPA argues that DC Plan I actually discriminated in plaintiffs' favor since older pilots

received larger contributions to their plans than younger pilots, which renders plaintiffs'

discrimination claim untenable.  In response, plaintiffs argue that ALPA has missed the point

since plaintiffs were to receive fewer retirement benefits under DC Plan I than they would have

received under the DB Plan, and will receive fewer benefits upon retirement than younger pilots.

However, it is plaintiffs who have missed the point because the terms of DC Plan I directly

contradict plaintiffs' allegations that the implementation of DC Plan I discriminated against

plaintiffs, and this Court need not accept these allegations as true. *See Rapoport*, 88 F. Supp. 2d at 184. Although DC Plan I significantly reduced plaintiffs' retirement benefits from what they were to receive under the DB Plan, the terms of the plan demonstrate that ALPA attempted to counter these harsh effects by requiring US Airways to make larger contributions to older pilots' plans. This fact explicitly contradicts plaintiffs' theory that ALPA intended to discriminate against plaintiffs by agreeing to implement DC Plan I.

Moreover, "[t]he duty of fair representation does not require that a union achieve absolute equality among its members." *Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers*, No. 99-CV-4341, 2002 WL 32152292, at *9 (E.D.N.Y. Nov. 4, 2002). "Actions taken by a union that disadvantage one group of constituents as opposed to another are permissible provided there is a legitimate, rational reason for the union's conduct." *Id.* at *10; *see also Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 457 (2d Cir. 1979) ("The Union was trying to make the best out of a bad situation, and it was almost inevitable that the Union's drawing of a line would hurt someone. Although it is unfortunate that in this case the ultimate harm fell on appellants, drawing the line elsewhere would, or reasonably could have been thought would, have caused harm to others."). As the Bankruptcy Court's decision in *In re US Airways Group, Inc.*, 296 B.R. 737, demonstrates, US Airways was facing a dire financial situation, and the Bankruptcy Court's approval of the DB Plan's termination was inevitable. Given these circumstances, as the FAC implicitly acknowledges, ALPA was forced to make concessions that would hurt all of its members, plaintiffs included, and the FAC offers insufficient evidence to even suggest that ALPA's actions are not supported

by a legitimate, rational reason.  *See Ramey*, 2002 WL 32152292, at *9.  Accordingly, Count III and the entirety of plaintiffs' DFR claims are dismissed.

### 2. *Plaintiffs' ADEA Claims*

ALPA also moves to dismiss plaintiffs' ADEA claims.  Although plaintiffs have imprecisely delineated their ADEA claims in the FAC, it appears to the Court that they assert two theories of discrimination against ALPA, under 29 U.S.C. §§ 623(c), 623(i).[11]  For both of these theories, plaintiffs essentially allege that ALPA discriminated against older pilots by helping create and failing to prevent the implementation of DC Plan I and DC Plan II.[12]  Each of these DC Plans, according to plaintiffs, provide older pilots, upon their retirement, with pensions considerably less than those that they would have received under the preceding pension plans, and enable younger pilots to receive more benefits upon retirement than plaintiffs.  ALPA argues that plaintiff's ADEA claims should be dismissed in their entirety, and as discussed below, the Court agrees.

### a. *ADEA Claims Under § 623(c)*

Section 623(c) "makes it unlawful for a labor union to 'exclude or to expel from its membership, or otherwise discriminate against, any individual because of his age.'"

*Dimitropoulos v. Painters Union Dist. Council 9*, 893 F. Supp. 297, 299 (S.D.N.Y. 1995)

---

[11]  The FAC cites to 29 U.S.C. §§ 623(a) and (j) as the statutory basis for their ADEA claims – subsections that are clearly inapplicable here.  However, given the nature of plaintiffs' allegations, the Court finds that plaintiffs simply failed to cite to the correct subsections, § 623(c), which prohibits discrimination by a "labor organization," and § 623(i), which pertains to non-discrimination in employee pension benefit plans.  Where referenced herein, the proper and relevant ADEA statute is noted.

[12]  Plaintiffs have not alleged that ALPA violated the ADEA by agreeing to the DB Plan's termination, nor would such a claim survive the instant motion since it is clear from the FAC that the DB Plan was terminated for all pilots, not just plaintiffs.

(quoting 29 U.S.C. § 623(c)(1)).  To prove a case of discrimination under the ADEA, plaintiffs must establish either a disparate impact or discriminatory treatment under the familiar standard announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[13]  Although plaintiffs have not specified under which theory they intend to proceed, at this stage, plaintiffs need not prove their case under either theory to survive a motion to dismiss; instead, they must provide enough support for their claims under "the ordinary rules for assessing the sufficiency of a complaint."  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002); *see also Bell Atlantic*, 127 S.Ct. at 1964-65.

To make out a *prima facie* case under a discriminatory treatment theory, plaintiffs must show that (1) they are members of a protected class; (2) they were qualified to receive the subject employee benefits; (3) they suffered an adverse employment action; and (4) the circumstances surrounding the challenged action gives rise to an inference of age discrimination. *Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 71 (2d Cir.), *cert. denied*, 543 U.S. 984 (2004); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466-67 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001); *Swierkiewicz*, 534 U.S. at 510.  In contrast, a *prima facie* case under a disparate impact theory requires plaintiffs to (1) identify the specific employment practice that is being challenged; (2) show the existence of an age-based disparity; and (3) show that the disparity has adversely affected members of the protected class.  *See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *Maresco v. Evans Chemetics, Div. of W.R. Grace*

---

[13]  Since the FAC does not assert any direct evidence of discrimination, and plaintiffs have not indicated that they intend to provide any direct evidence of discrimination, proof of plaintiffs' ADEA claim under § 636(c)(1) is limited to a discriminatory treatment or disparate impact theory.  *See Swierkiewicz*, 534 U.S. 506, 511 (2002) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.") (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

& Co., 964 F.2d 106, 115 (2d Cir. 1992).  Under both theories, once the *prima facie* case is proven, the well-known burden-shifting analysis comes into play, where ALPA would need to establish that it committed the challenged action based upon "reasonable" non-age reasons, *see Meacham v. Knolls Atomic Power Lab.*, --- U.S. ----, 128 S.Ct. 2395, 2401 (2008); *Smith*, 544 U.S. at 228, and, if sufficiently shown, plaintiffs must then satisfy the factfinder that ALPA's reasons are pretextual.  *See Stratton v. Dep't for the Aging,* 132 F.3d 869, 879 (2d Cir. 1997).

Although plaintiffs have not definitively conveyed whether they intend to prove the existence of discriminatory treatment or disparate impact,[14] there is no dispute that plaintiffs have alleged the requisite elements under both theories.[15]  However, ALPA disputes whether plaintiffs' allegations of adverse action, under both theories, are sufficient.[16]  Plaintiffs' lone allegation of adverse action is that younger pilots will receive more retirement benefits than plaintiffs under both DC Plans.  ALPA argues that this allegation is insufficient because plaintiffs' harm is premised solely on the fact that older pilots will work fewer years than younger pilots and will ultimately accrue less in retirement benefits.  According to ALPA, this

---

[14]  Plaintiffs add further confusion to the parsing of their age discrimination claims by citing to 29 U.S.C. § 623(i) in support of their amorphous discriminatory treatment/disparate impact claim.  As stated above, *see supra* note 11, a disparate impact or discriminatory treatment claim can only be properly asserted under § 623(c), not subsection (i), which relates specifically to discrimination in the terms of an employee's pension plan (*i.e.*, the cessation or reduction of the rate at which benefits accrue or are contributed to the pension plan) – a claim that exists independently in the FAC.

[15]  In addition, ALPA has not challenged the sufficiency of plaintiffs' allegations regarding:  (1) as to discriminatory treatment, whether plaintiffs are members of a protected class or qualified to receive the employee benefits; or (2) as to disparate impact, whether plaintiffs have identified the specific action they are challenging.

[16]  Although ALPA largely fails to discuss plaintiffs' § 623(c) claim in its moving memorandum of law, it addresses the claim in its reply, attributing its initial failure to plaintiffs' "shifting tactics." Reply Memorandum of Law of [ALPA] ("ALPA Reply Mem."), p. 5.  Nonetheless, some of the same arguments raised in ALPA's moving memorandum of law apply to this claim, and ALPA itself raises some of these same theories of dismissal in its reply to attack this particular theory of age discrimination.

allegation demonstrates that older pilots are negatively affected by the passage of time, not any age discrimination.  In support of this argument, ALPA relies upon several cases, most notably *Cooper v. IBM Pers. Pension Plan*, 457 F.3d 636 (7th Cir. 2006), *cert. denied*, 127 S.Ct. 1143 (2007), which ruled that the implementation of a cash-balance plan in lieu of a traditional defined benefit plan does not constitute age discrimination when older employees receive fewer benefits upon retirement than younger employees.[17]  *See, e.g., Bryerton v. Verizon Commc'ns, Inc.*, No. 06 Civ. 6672, 2007 WL 1120290, at *4 (S.D.N.Y. Apr. 17, 2007), *aff'd, Hirt v. Equitable Ret. Plan For Employees, Managers and Agents*, --- F.3d ----, 2008 WL 2669346 (2d Cir. July 9, 2008); *Register v. PNC Fin. Serv. Group, Inc.*, 477 F.3d 56, 69 (3rd Cir. 2007). Although *Cooper* and the other cases cited by ALPA involve the statutory interpretation of age discrimination under ERISA and raise issues that pertain more to plaintiffs' § 623(i) claim, ALPA argues that the general principles from those cases are equally relevant to this claim because the "the only conceivable disparate impact" is that plaintiffs "will have less time to earn investment income . . . ."  ALPA Reply Mem., p. 5.

Plaintiffs have asserted a single basis for adverse action, which is that the ultimate retirement benefits received by plaintiffs will be less than those received by younger pilots, and the principles and policies articulated in *Cooper* are relevant here.  It is clear that the differences between older and younger pilots' ultimate retirement benefits is the result of basic economics, specifically the time value of money, and is not related to the older pilots' age.  *See Cooper*, 457

---

[17]  A detailed analysis of the relevant differences between a cash balance plan, a defined contribution plan, and a defined benefit plan is provided in *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 612 (6th Cir. 2007), but for this Court's purposes, it is sufficient to note that cash balance plans "are structured to function like a defined contribution plan.  *Id.*; *see also Hirt v. Equitable Ret. Plan For Employees, Managers and Agents*, --- F.3d ----, 2008 WL 2669346, at *1-*2 (2d Cir. July 9, 2008).

F.3d at 642. As explained in *Cooper*, plaintiffs do not have their age to blame for the differing retirement benefits, but rather compound interest and the time value of money. *Id*. at 638; *see also Bryerton*, 2007 WL 1120290, at *4 ("the fact that a younger employee's pay credits are eventually worth more than those paid to an older employee . . . results not from discrimination, but from the fact that the younger employee has had more time to accumulate interest . . . . In other words, the discrepancy results from the time value of money.") (internal citations omitted). This fact is clear from both DC Plans because DC Plan II was age-neutral and DC Plan I, which required greater contributions to older pilots' pension plans, nonetheless resulted in older pilots receiving fewer benefits than younger pilots upon their retirement. Thus, plaintiffs' lone allegation of adverse action is insufficient to support their claim of age discrimination.

Plaintiffs attempt to distinguish *Cooper* by correctly noting that courts in this Circuit have rejected its holding. *See, e.g., In re J.P. Morgan Chase Cash Balance Litig.*, 460 F. Supp. 2d 479, 488-89 (S.D.N.Y. 2006), *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 342-43 (S.D.N.Y. 2006). However, those cases disputed *Cooper*'s statutory interpretation of ERISA, and concluded that *Cooper* is not consistent with the Second Circuit's holding in *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000). To be clear, this Court is not relying upon *Cooper*'s statutory analysis of ERISA, but rather the policies and principles enunciated therein and followed by other courts in this Circuit. *See Amara v. Cigna Corp.*, 534 F. Supp. 2d 288, 318 (D. Conn. 2008) (collecting cases); *Bryerton*, 2007 WL 1120290, at *4; *Hirt v. Equitable Ret. Plan For Employees, Managers and Agents*, 441 F. Supp. 2d 516, 548-49 (S.D.N.Y. 2006), *aff'd*, --- F.3d ----, 2008 WL 2669346 (2d Cir. July 9, 2008); *see also Kentucky Retirement Sysems v. EEOC*, 128 S.Ct. 2361, 2367 (2008) ("[A]s a matter of pure logic, age and

pension status remain analytically distinct concepts. That is to say, one can easily conceive of decisions that are actually made because of pension status and not age, even where pension status is itself based on age.") (internal quotation marks and citation omitted); *Lockheed Corp. v. Spink*, 517 U.S. 882, 897 (1996) ("A reduction in total benefits due is not the same thing as a reduction in the rate of benefit accrual; the former is the final outcome of the calculation, whereas the latter is one of the factors in the equation."). Moreover, the Second Circuit has recently declared that it shares the view expressed in *Cooper*, and similar decisions issued by the Third and Sixth Circuit Courts of Appeals, that cash balance plans do not violate ERISA, effectively overruling district court decisions in this Circuit that failed to follow *Cooper*'s interpretation of ERISA. *Hirt*, 2008 WL 2669346, at *5.

ALPA also argues that, even if plaintiffs have established a *prima facie* case, the ADEA's safe harbor provision, 26 U.S.C § 623(f), referred to as the "equal cost or equal benefits" principle, precludes plaintiffs' claims under § 623(c). Section 623(f) provides, in relevant part:

> *It shall not be unlawful* for . . . [a] labor organization . . .
>
> (2) to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section . . .
>
> (B) to observe the terms of a bona fide employee benefit plan --
>
> (i) where, for each benefit or benefit package, the actual amount of *payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker*, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989);

26 U.S.C § 623(f) (emphasis added). Thus, "a benefit plan will be considered in compliance with the [ADEA] where the actual amount of payment made, or cost incurred, in behalf of an

older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits . . . ." 29 C.F.R. § 1625.10(a)(1). Pursuant to the last sentence of § 623(f), a "labor organization acting under subparagraph (A), or under clause (i) or (ii) of subparagraph (B), shall have the burden of proving that such actions are lawful . . . ."  Thus, the burden of proving the applicability of the safe harbor provision lies with ALPA.  ALPA argues that it is clear from the FAC that both DC Plans incur costs and provide benefits to older pilots that are no less than those incurred and provided to younger pilots, and that plaintiffs' ADEA claims should be dismissed.

In response, plaintiffs raise three unpersuasive arguments to dispute the applicability of the safe harbor provision.  First, plaintiffs argue that the safe harbor provision is inapplicable here because both DC Plans are not "bona fide" plans under § 623(f).  In so arguing, plaintiffs rely solely upon a decision outside of this Circuit, *Casillas v. Fed. Ex. Corp.*, 140 F. Supp. 2d 875 (W.D. Tenn. 2001), which held that a seniority system was not bona fide under § 623(f)(2)(A) because it was "adopted . . . [and] operated with discriminatory intent."  *Id.* at 885.  In relying upon *Casillas*, plaintiffs argue that the FAC alleges that both DC Plans were implemented with a discriminatory intent, and therefore are not "bona fide" under § 623(f)(2)(B).  However, plaintiffs' argument fails, primarily because they believe the meaning ascribed to "bona fide" in *Casillas* is equivalent to the meaning of "bona fide" in a different subsection of the ADEA.  Not only does *Casillas* reference a subsection dealing with seniority systems rather than the subsection regarding employee benefit plans – the only subsection with which this Court is concerned – but plaintiffs' proffered meaning of "bona fide" in § 623(f)(2)(B) is inconsistent with the established meaning of that phrase.  *See* 29 C.F.R. §

1625.10(b) ("A plan is considered 'bona fide' if its terms . . . have been accurately described in writing to all employees and if it actually provides the benefits in accordance with the terms of the plan."); *see also Breitigan v. New Castle County*, No. C.A.02-1333-GMS, 2005 WL 3544296, at *5 (D.Del. Dec. 27, 2005) (noting that Supreme Court precedent has established that a "retirement plan is 'bona fide' within the meaning of the ADEA if it exists and pays benefits.") (citation omitted); *New York 10-13 Ass'n v. City of New York*, No. 98 Civ. 1425, 1999 WL 177442, at *7 (S.D.N.Y. Mar. 30, 1999) (dismissing the plaintiff's ADEA claims under § 623(f) after quoting and relying upon 29 C.F.R. § 1625.10(b) to find that the subject pension plan was bona fide).  Since the FAC established that the DC Plans were written and provided benefits according to the terms of the respective plan, the plans are "bona fide" for purposes of § 623(f).

       Plaintiffs next argue that the facts necessary to determine whether the safe harbor defense is applicable – namely, the amount of costs incurred under the DC Plans – are not within the FAC and thus cannot be determined on a motion to dismiss.  Plaintiffs are correct that there are no allegations in the FAC regarding the costs of either DC Plan, but the safe harbor provision also applies if the payments to older and younger workers are not disparate, which are facts explicitly alleged in the FAC and demonstrated by the terms of the plans.  Under DC Plan II, older and younger pilots receive the same contribution rate so the safe harbor precludes plaintiffs' ADEA action regarding that plan.  *See* FAC ¶ 515 ("Under [DC Plan II], a pilot's pension proceeds were to be a flat 10 percent of wages.").  As to DC Plan I, although older and younger pilots did not receive equal contribution rates, older pilots certainly received contributions that were "no less than that" received by younger pilots.  26 U.S.C. § 623(f)(2)(B)(i); *see also Gen. Dynamics v. Clere*, 540 U.S. 581, 600 (2004) ("We see the text,

structure, purpose, and history of the ADEA, along with its relationship to other federal statutes, as showing that the statute does not mean to stop an employer from favoring an older employee over a younger one."); *Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193, 216 (3rd Cir. 2000) ("In order to take advantage of the safe harbor, an employer need not provide equal benefits to older and younger retirees, and it need not spend more on behalf of older retirees.  It merely must spend equally."), *cert. denied*, 532 U.S. 913 (2001).

Finally, plaintiffs captiously argue that the safe harbor provision is inapplicable because it only applies to claims asserted under § 623(a), (b), (c), and (e), and plaintiffs' ADEA claim is only under § 623(i).  However, the FAC clearly asserts a claim under § 623(c) and ALPA has raised the safe harbor provision as a defense to plaintiffs' claims under that particular subsection of the ADEA.  Plaintiffs have been far from clear in articulating the exact nature, and statutory basis, of their ADEA claims – whether purposefully or inadvertently – which has confounded ALPA and this Court.  Despite this lack of clarity, ALPA has established that the safe harbor provision applies, and plaintiffs' ADEA claim under § 623(c) is dismissed pursuant to 26 U.S.C. § 623(f)(2)(B)(I).

 

 

**b.**      ***ADEA Claims Under § 623(i)***

The FAC also asserts an ADEA claim under 29 U.S.C. § 623(i),[18] which makes it unlawful to cease or reduce, on the basis of age, the rate at which benefits accrue or are contributed to an employee's pension plan. ALPA argues that this claim should also be dismissed since the FAC demonstrates that the DC Plans did not reduce or discontinue contributions to plaintiffs' plans based on age. As the Court previously noted, the FAC alleges that DC Plan I required US Airways to make larger contributions to older pilots than younger pilots because they were so close to retirement, and DC Plan II removed consideration of age altogether by making every contribution to a pilot's pension a flat rate, at 10% of his or her annual salary. Thus, as discussed at length above, neither DC Plan ceased or reduced the amount of contributions paid based on age. *See Bryerton*, 2007 WL 1120290, at *4; *Hirt*, 441 F. Supp. 2d at 548-49; *see also Lockheed Corp.*, 517 U.S. at 897. Accordingly, plaintiffs' ADEA claim under 29 U.S.C. § 623(i) is dismissed.

### 3.    *Plaintiffs' RICO Claims*

The final claim asserted against ALPA is under RICO, which authorizes "any person injured in his business or property by reason of a violation of [18 U.S.C.] § 1962" to bring an action. 18 U.S.C. § 1964(c); *see also Attick v. Valeria Assocs., L.P.*, 835 F. Supp. 103, 110 (S.D.N.Y. 1992). Under § 1962(c),[19] plaintiffs must show that ALPA was engaged in the "(1)

---

[18]  Although plaintiffs have stated that the "gravamen" of their ADEA claim is ALPA's conduct "in establishing and maintaining" the DC Plans, it nonetheless appears that plaintiffs have not withdrawn their ADEA claim related to the "terms of DC Plan I and DC Plan II . . . ." Opp. to ALPA, p. 34. Accordingly, the Court will address that claim in the context of ALPA's motion to dismiss.

[19]  Although plaintiffs fail to specify the exact subsection of RICO that they rely upon, the most plausible source is § 1962(c) since the FAC does not assert facts related to any other subsection of § 1962, including conspiracy to violate any subsection of § 1962. *See* § 1962(d). Thus, the Court finds that the RICO cause of action is premised solely on § 1962(c).

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L.*

*v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also First Capital Asset Mgmt., Inc. v.*

*Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("The RICO statute makes it unlawful 'for any

person employed by or associated with any enterprise . . . to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'")

(quoting 18 U.S.C. § 1962(c)). "The requirements of section 1962(c) must be established as to

each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.), *cert. denied*, 534

U.S. 891 (2001). In addition, plaintiffs must prove that their injuries were "proximately caused"

by the alleged pattern of racketeering activity. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S.

451, 460-61 (2006).

Plaintiffs attempt to satisfy this standard by essentially alleging that ALPA, along with

US Airways and RSA, formed an "association-in-fact for the purpose of devising and carrying

out a scheme to defraud US Airways' pilots," including plaintiffs, and through various acts over

the course of four years, they "decimat[ed] the pilot's pension plan" for their own "financial and

monetary advantages." FAC ¶¶ 541-44. This "enterprise," according to the FAC, was managed,

directed, and devised by each defendant. *Id.* ¶¶ 545-48. In addition, each defendant participated

in strategies that were devised or directed by the other defendants, and acted as an agent for the

other defendants. *Id.* ¶¶ 549-50. The FAC finally alleges that the enterprise violated RICO

because it engaged in the following racketeering activities (*i.e.*, predicate acts): wire fraud (18

U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341); solicitation to influence operations of an

employee benefit plan (18 U.S.C. § 1954); fraud in connection with a case under title 11 (*i.e.*,

fraud in Bankruptcy Court); and financial transactions between a union and employer (29 U.S.C. § 186).

However, ALPA argues that plaintiffs' RICO cause of action should be dismissed because they have failed to sufficiently state a RICO claim.[20]  In particular, ALPA argues that plaintiffs have failed to sufficiently allege (1) the existence of a RICO "enterprise"; (2) that ALPA committed the requisite two predicate acts; and (3) a "pattern" of racketeering activity.

### a. RICO Enterprise

An "enterprise" is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Although enterprise is defined in terms of "persons," it includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  To prove the existence of an enterprise, a plaintiff must provide "evidence of an ongoing organization, formal or informal, and . . . that the various associates function as a continuing unit."  *Turkette*, 452 U.S. at 583.  In addition, the "enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise."[21]  *First Capital*, 385 F.3d at 173 (internal

---

[20]  ALPA also argues that it should not be amenable to an action under RICO since its liability under that statute is intertwined with federal labor law.  Given that the FAC fails to sufficiently state a RICO cause of action, the Court declines to address this alternative argument for dismissal.

[21]  Although some courts in this Circuit have stated that the issue of whether a plaintiff must allege that an enterprise's existence is distinct from the predicate acts it has engaged in is unsettled, *see Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800, 2006 WL 3833440, at *15 (S.D.N.Y. Dec. 29, 2006) (citing *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 493-500 (S.D.N.Y. 2006)), this Court disagrees.  As Judge I. Leo Glasser recognized in *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 468-74 (E.D.N.Y. 2007), following a well-reasoned analysis, this issue is settled because, contrary to the holding in *World Wrestling Entm't*, there is no inconsistency between the Second Circuit's decisions in *United States v. Mazzei*, 700 F.2d 85 (2d Cir. 1983), and *First Capital*, 385 F.3d at 159.  Accordingly, as Judge Glasser held, "it remains the law in this

quotation marks and citations omitted); *see also Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[A] corporate entity may not be both the RICO person and the RICO enterprise.").  Also, each "RICO defendant must have played *some* part in directing [the enterprise's] affairs." *First Capital*, 385 F.3d at 176.

Here, ALPA primarily argues that plaintiffs have failed to adequately show that the alleged association-in-fact enterprise between US Airways, RSA, and ALPA had a common purpose or that ALPA exercised any control over the enterprise.  When liberally read, the FAC alleges that defendants were intent on continually reducing pilots' pensions, and the numerous facts alleged in the FAC sufficiently support the existence of a common purpose among defendants, multiple interactions between defendants, and an ascertainable structure of the enterprise.  *See Am. Med. Ass'n*, 2006 WL 3833440, at *15.  Moreover, when reading the FAC in the light most favorable to plaintiffs, the allegations demonstrate that the enterprise is distinct from the alleged predicate acts.  ALPA's unsupported argument that it had no reason to join in the alleged enterprise given the nature of its relationship with US Airways is similarly unavailing because the Court is obliged to read the FAC in plaintiffs' favor.

Regarding plaintiffs' allegations concerning ALPA's control over the enterprise, the Second Circuit has stated that this element is easily satisfied since it simply requires that the defendant "participated in the operation or management of the enterprise itself." *First Capital*, 385 F.3d at 176; *see also Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993).  Although the

Circuit that a RICO plaintiff alleging the existence of an association-in-fact RICO enterprise must plead and prove the existence of a group of individuals or other legal entities operating as a continuing unit with a formal or informal structure and united by some common purpose in order to state a valid claim." *Longshoremen's Ass'n*, 518 F. Supp. 2d at 474.  This Court will therefore apply the *First Capital* standard to plaintiffs' allegations of an enterprise.

allegations in the FAC concerning ALPA pertain largely to what it failed to do in furtherance of the alleged enterprise – such as failing to timely audit the DB Plan and giving in to each concession requested by US Airways – plaintiffs have met the minimal threshold of "some" participation in the enterprise's affairs. In support of plaintiffs' conclusory allegation that each defendant "played a significant role in directing the affairs of the enterprise," FAC ¶ 545, the FAC indicates that ALPA misrepresented various facts to its members and received fees for its role in the enterprise. ALPA primarily disputes the truth of certain allegations in the FAC, namely that it received any fees in connection with the DC Plans, but at this stage of the proceedings, the Court must accept the allegations as true. Thus, plaintiffs have sufficiently proven the existence of a RICO enterprise.

### b.    *Predicate Acts of Racketeering Activity*

ALPA also challenges the FAC's allegations that the RICO enterprise committed five criminal acts delineated in § 1962, which constitute sufficient predicate acts of racketeering activity. ALPA argues that two of these alleged criminal acts, 18 U.S.C. § 1954 and 29 U.S.C. § 186, do not apply to labor unions such as ALPA, and violations of the remaining statutes, which relate to fraud, have not been sufficiently pled to satisfy Fed. R. Civ. P. 9(b).

Section 1954 makes it unlawful for an individual to receive or solicit "any fee, kickback, commission, . . . or thing of value" in exchange for influencing an employee pension plan. 18 U.S.C. § 1954; *see also United States v. Romano*, 684 F.2d 1057, 1063-64 (2d Cir.), *cert. denied*, 459 U.S. 1016 (1982). It is clear that the statute targets individual conduct, not any organization or union, and plaintiffs do not dispute this reading of § 1954. Plaintiffs instead argue that ALPA's culpability is premised on its individual employees accepting benefits on behalf of

ALPA. However, this allegation is not made clear in the FAC, and plaintiffs have offered no legal support for imputing ALPA's employees' alleged violations of § 1954 to ALPA. As a result, 18 U.S.C. § 1954 cannot serve as a predicate act for plaintiffs' RICO claims against ALPA.

Similarly, 29 U.S.C. § 186, which makes certain financial transactions between a union and an employer unlawful, explicitly does not apply to employers and employees subject to the Railway Labor Act ("RLA"). *See* 29 U.S.C. §§ 152(2) and (3); *see also United States v. Davidoff*, 359 F. Supp. 545, 546 (E.D.N.Y. 1973). The RLA "includes within its coverage 'every common carrier by air engaged in interstate or foreign commerce . . . and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers,'" *Davidoff*, 359 F. Supp. at 546 (quoting 18 U.S.C. § 181), and it is undisputed that the FAC alleges that ALPA and US Airways are subject to the RLA. Plaintiffs seek to get around this barrier by requesting that the Court set aside this statutory bar because it would lead to an "absurd or inequitable result." Opp. to ALPA, p. 30 n.4. This Court declines plaintiffs' invitation to set aside this long-standing exception, especially since plaintiffs have offered no legal basis for not applying the exception. Thus, § 186 also cannot serve as predicate act for plaintiffs' RICO claims against ALPA.

The three remaining predicate acts all pertain to fraud – namely, mail fraud, wire fraud, and fraud in connection with a bankruptcy proceeding – and, in accordance with Fed. R. Civ. P. 9(b), must be alleged with specificity. ALPA primarily argues that plaintiffs' allegations fail to comply with Rule 9(b) because they do not provide a strong inference of fraudulent intent and

they do not specify the fraudulent conduct committed by ALPA that furthered the enterprise's scheme.[22]

First, for predicate acts premised on fraud, scienter is an essential element that need not be specifically alleged to satisfy Rule 9(b). *See Powers v. British Vita*, 57 F.3d 176, 184 (2d Cir. 1995); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). However, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations," *Shields*, 25 F.3d at 1128 (internal quotation marks and citations omitted), because a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." *Id*.; *see also First Capital*, 385 F.3d at 1179. A plaintiff's allegations can give rise to a strong inference of fraudulent intent in two ways. First, the plaintiff may allege "a motive for committing fraud and a clear opportunity for doing so." *Powers*, 57 F.3d at 184 (internal quotations marks and citation omitted). Second, where no motive is apparent, the plaintiff may plead scienter by "identifying circumstances indicating conscious behavior by the defendant, though the strength of circumstantial allegations must be correspondingly greater." *Id*.

Here, the only allegation of ALPA's fraudulent intent is that it was promised substantial fees for managing the DC Plans – which ALPA has repeatedly denied, but must be accepted as true. From this sole allegation of ALPA's motives, plaintiffs seek to establish that ALPA

---

[22] As to the alleged bankruptcy fraud, ALPA also argues that plaintiffs have completely failed to allege that ALPA committed bankruptcy fraud because they have not identified the statute that ALPA violated and have even conceded that the allegations of bankruptcy fraud were only asserted against US Airways. Apart from the absence of any allegation of bankruptcy fraud asserted against ALPA in the FAC, the Court agrees that plaintiffs have conceded that there is no allegation of ALPA committing bankruptcy fraud. Thus, bankruptcy fraud cannot serve as a predicate act to support plaintiffs' RICO claims against ALPA, and need not be further discussed.

entered into the alleged enterprise with US Airways and RSA to deplete plaintiffs' pension plans and fill the other defendants' pockets. Plaintiffs' lone allegation of ALPA's motives is wholly inadequate to create any inference of ALPA's fraudulent intent, let alone a strong inference. *See First Capital*, 385 F.3d at 1179. Although the FAC indicates that ALPA had opportunities to commit a fraud upon plaintiffs, the lack of adequate allegations regarding ALPA's motives is insurmountable.

Similarly, plaintiffs have failed to raise a strong inference of ALPA's fraudulent intent by demonstrating ALPA's conscious behavior. In an effort to satisfy the conscious behavior test, plaintiffs point to (1) ALPA's "secret negotiations" with US Airways to terminate the DB Plan; (2) ALPA's failure to timely perform an audit of the DB Plan; and (3) ALPA's failure to follow-through with its promise to permit its members to ratify the DB Plan's termination and the follow-up plan. However, none of these factual allegations are significant enough to strongly indicate that ALPA harbored a fraudulent intent to injure plaintiffs. First, as the Bankruptcy Court recognized, ALPA did not agree to terminate the DB Plan during the "secret negotiations." Once the Bankruptcy Court held that US Airways could pursue a distress termination of the DB Plan, ALPA reasonably agreed to terminate the DB Plan and implement DC Plan I. Second, the Court is unable to infer any fraudulent intent from ALPA's failure to timely perform an audit of the DB Plan given that ALPA eventually did conduct an audit which verified US Airways' prior statements regarding the health of the DB Plan. Finally, the allegation that ALPA reneged on a promise to its members is simply insufficient. *See Powers*, 57 F.3d at 185 ("[t]he mere non-performance of promises is insufficient to create an inference of fraudulent intent"). Thus, the FAC fails to assert sufficient allegations that give rise to a strong inference of fraudulent intent.

Second, ALPA argues that the FAC fails to allege adequate acts to support their claim that ALPA committed mail and wire fraud.[23] ALPA does not appear to challenge plaintiffs' allegations regarding the details of the alleged fraudulent acts – "the contents of the communications, who was involved, where and when they took place," *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) – but whether the FAC sufficiently explains how the acts were fraudulent. Since plaintiffs' allegations of mail and wire fraud consist simply of the posting of defendants' various false promises and statements on the respective websites of ALPA and US Airways, ALPA argues that plaintiffs have failed to adequately show how the various statements were fraudulent. To the contrary, the FAC is quite detailed in its factual allegations, which enables the Court to easily infer plaintiffs' allegations of fraud. The degree of detail ALPA seeks to hold plaintiffs accountable for is not required by Rule 9(b). *See Mills*, 12 F.3d at 1175; *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999); *see also Manning v. Utilities Mut. Ins. Co.*, No. 98 Civ. 4790, 1999 WL 782569, at *4 (S.D.N.Y. Sept. 30, 1999) ("To satisfy Rule 9(b), Plaintiff's pleadings must contain sufficient detail to give Defendants notice of the transactions intended to be proven and the elements of the claims.") (internal quotation marks and citation omitted), *rev'd on other grounds*, 254 F.3d 387 (2d Cir. 2001). Nonetheless, plaintiffs' mail and fraud claims cannot serve as predicate acts since the FAC fails to allege facts that give rise to a strong inference of fraudulent intent.

### c.     *Pattern of Racketeering Activity*

---

[23] As an initial matter, both mail and wire fraud require the proof of "two elements– (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts) and (2) use of the mail [or wires] for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Carter v. United States*, 530 U.S. 255, 261 (2000); *see also Mathon v. Feldstein*, 303 F. Supp. 2d 317, 323 (E.D.N.Y. 2004) (citing *United States v. Lemire,* 720 F.2d 1327 (D.C. Cir. 1983), which noted that the requisite elements of wire and mail fraud are identical).

With respect to the pattern requirement, the RICO statute states only that a "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). The Supreme Court has determined that "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). As to the proof necessary to show the existence of continued criminal activity, the Supreme Court held that a plaintiff "must prove [the] continuity of racketeering activity, or its threat." *Id.* at 241. Thus, to establish a "threat of continued criminal activity," a plaintiff must show either "closed-ended continuity" or "open-ended continuity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *see also H.J., Inc.*, 492 U.S. at 241-42.

A plaintiff can prove "continuity over a closed period by proving a series of related predicates extending over a substantial period of time," *H.J., Inc.*, 492 U.S. at 242, and a "substantial period of time" is considered greater than "a few weeks or months" and is certainly achieved within "a matter of years." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (citations omitted), *cert. denied*, 518 U.S. 1017 (1996). Open-ended continuity, on the other hand, requires proof "that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *First Capital*, 385 F.3d at 180 (quoting *Cofacredit*, 187 F.3d at 242).

Here, ALPA argues that plaintiffs have not sufficiently alleged "continued criminal activity" by either closed-ended or open-ended continuity. In contending that plaintiffs have not sufficiently alleged closed-ended continuity, ALPA argues that they have failed to allege that the

predicate acts continued for at least the requisite two years. There is no dispute that plaintiffs

must allege acts that continued for at least two years, *see First Capital*, 385 F.3d at 181 ("this

Court has never found a closed-ended pattern where the predicate acts spanned fewer than two

years."), but plaintiffs and ALPA dispute the alleged start and end date of the relevant acts. In

arguing that closed-ended continuity is not satisfied, ALPA construes the objective of the alleged

enterprise as solely to terminate the DB Plan, which occurred one year after the time period in

which plaintiffs alleged the enterprise was formed. Plaintiffs, on the other hand, argue that the

alleged objective of the enterprise was broader – namely, to continually reduce pilots' pensions –

which included acts after the DB Plan was terminated.[24] Under plaintiffs' theory, closed-ended

continuity is satisfied because the first predicate act alleged (*i.e.*, wire fraud against ALPA for

stating that the DB Plan was underfunded as of February 2002) occurred nearly three years

before the last predicate act alleged (*i.e.*, mail fraud against US Airways for mailing the 2002 DB

Plan Summary, which states that the DB Plan was adequately funded). *See* Opp. to ALPA, p. 32.

However, because none of plaintiffs alleged predicate acts are sufficient, as the Court

explained above, plaintiffs' theory regarding closed-ended continuity is not feasible. Even if

plaintiffs articulate the alleged enterprise's objective broadly, the start and end date of the

relevant acts cannot be premised upon inadequate predicate acts. *See Spool v. World Child Int'l*

*Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) ("The relevant period [for closed-ended

continuity] . . . is the time during which RICO predicate activity occurred, not the time during

which the underlying scheme operated or the underlying dispute took place."); *De Falco*, 244

---

[24] Although the section of the FAC delineating the RICO-based facts does not include any reference to DC Plan II, the first paragraph of that section incorporates every previous paragraph, which does reference the issues surrounding DC Plan II.

F.3d at 321 ("The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit."). As such, plaintiffs cannot satisfy closed-ended continuity.

ALPA also claims that plaintiffs have failed to demonstrate open-ended continuity, which can be sufficiently pleaded in a number of ways. A plaintiff can show that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future,"or that "the predicate acts or offenses are a part of an ongoing entity's way of doing business," whether or not that business exists primarily for criminal purposes. *H.J.*, 492 U.S. at 242-43. To show that the predicate acts are an entity's way of doing business, a plaintiff must either allege that the entity exists for criminal purposes (as is the case with organized crime syndicates), or that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* at 243. When an enterprise's objectives are primarily or inherently unlawful, the threat of continued criminal activity is presumed, but when the enterprise primarily conducts a legal business, there is no presumption of a continued threat. *Spool*, 520 F.3d at 185-86; *Cofacredit*, 187 F.3d at 243. Without the presumption of future criminal conduct, a plaintiff must provide "some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Spool*, 520 F.3d at 185 (quoting *Cofacredit*, 187 F.3d at 243).

Here, plaintiffs have not alleged that ALPA's primary business is unlawful so they must provide some strong evidence of continued criminal activity. Yet, plaintiffs only claim that there is still a risk of future criminal conduct by ALPA is the fact that ALPA continues to be plaintiffs' exclusive bargaining representative. Plaintiffs do not indicate that this allegation is premised

upon future predicate acts or the threat of any criminal activity. Rather, it appears that plaintiffs are relying on bald speculation as to the future acts of ALPA and the alleged "enterprise," which is insufficient. *See GICC Capital*, 67 F.3d at 466. Moreover, plaintiffs have explicitly told the Court that they have no additional allegations to assert in support of their RICO claims even though it has been nearly two years since the FAC was filed.[25] Thus, plaintiffs have failed to demonstrate open-ended continuity. Accordingly, plaintiffs' RICO claims against ALPA are dismissed.

Since all of plaintiffs' claims against ALPA are dismissed, the final matter that this Court must address is plaintiffs' request for leave to amend the complaint with respect to any of the claims that are dismissed. As the Court has demonstrated above, any further amendments to the complaint would be futile – especially since plaintiffs' counsel declared at oral argument that plaintiffs have no additional facts to allege to this fourth amended complaint. *See Caputo v. Pfizer*, 267 F.3d 181, 191 (2d Cir. 2001). As a result, plaintiffs are denied leave to further amend the complaint.

### B.     RSA's Motion to Dismiss

The only claim asserted against RSA is a RICO claim, and RSA argues that this claim should be dismissed because it has been insufficiently pled.[26] Specifically, RSA argues that the

---

[25] Also, plaintiffs' inability to demonstrate any continued criminal activity by the alleged enterprise is also evident from their failure to add any new allegations to their RICO claims after amending the complaint approximately one year after first asserting their RICO claims.

[26] RSA also argues that plaintiffs' RICO claims should be dismissed because it is entitled to sovereign immunity. However, because this Court finds that the RICO claims asserted against RSA should be dismissed under Rule 12(b)(6) and Rule 9(b), it declines to decide RSA's constitutional argument. *See Tory v. Cochran*, 544 U.S. 734, 740 (2005) (Thomas, J., dissenting) ("As a prudential matter, the better course is to avoid passing unnecessarily on the constitutional question.") (citing *Ashwander v. TVA*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring)).

43

RICO claim fails to plead all the necessary elements to make out a viable RICO claim, and the fraud allegations in the claim are not pled with the necessary specificity, as required by Fed. R. Civ. P. 9(b). As discussed below, plaintiffs' RICO claims against RSA are dismissed under Rule 12(b)(6) and Rule 9(b).

In describing plaintiffs' allegations against RSA, the Court will not repeat the numerous allegations against all defendants since those are detailed above in the discussion of ALPA's motion to dismiss. The FAC alleges that RSA was designated as the equity sponsor of US Airways in the 2002 Bankruptcy, which required RSA to provide $500 million debtor-in-possession financing in exchange for nearly 37% ownership of US Airways and super-voting rights once the bankruptcy proceedings had concluded. Thereafter, in early December 2002, while US Airways was still in bankruptcy, US Airways and RSA publicly declared that they needed to obtain "additional labor cost savings" and "'resolve' . . . pension funding problems" to obtain a loan guarantee from the ATSB and emerge from bankruptcy. FAC ¶¶ 596, 601. Subsequently, ALPA began conducting "secret meetings" with US Airways regarding the termination of the DB Plan, but there is no reference of RSA's involvement in these meetings. In fact, the only reference to RSA, with respect to the termination of the DB Plan, is that it and US Airways made "various threats of liquidation" during subsequent discussions with ALPA about terminating the DB Plan and implementing a DC Plan. *Id.* ¶¶ 643-44.

The FAC further alleges that once US Airways emerged from the 2002 Bankruptcy, it repaid "nearly all of the expended debtor-in-possession facility" RSA had provided, and as a result, RSA acquired nearly 37% interest in US Airways and super-voting rights. *Id.* ¶¶ 654-57. RSA's CEO, David Bronner, was immediately named chairman of US Airways' board of

directors, and while in that capacity, Bronner made various statements regarding liquidating the company if additional employee concessions were not obtained. These statements, the FAC alleges, indicate that RSA was focused on recouping its investment and doing so at the expense of plaintiffs' pensions.

In its motion to dismiss, RSA claims that plaintiffs have failed to sufficiently allege (1) a "pattern" of racketeering activity; (2) the existence of any "racketeering activity"; and (3) all of the necessary elements as against both RSA and RSA Holdings. The FAC is deficient in all three respects, and plaintiffs' opposition to the motion is devoid of any argument disputing RSA's contention that the RICO claim must be dismissed.

First, the FAC alleges a single predicate act against RSA, which consists only of a conclusory allegation that RSA committed fraud in connection with a case under Title 11, which is identified as a predicate in 18 U.S.C. § 1961(1). As noted above, to sufficiently allege a "pattern" of racketeering activity, plaintiffs must allege "at least two acts of racketeering activity" that occurred within ten years of each other. 18 U.S.C. § 1961(5). Second, Plaintiffs' conclusory statement that RSA committed bankruptcy fraud is insufficient to adequately state a predicate act because the FAC fails to submit facts to explain how RSA committed the alleged criminal act. *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1129-30 (E.D.N.Y. 1992). Additionally, plaintiffs' allegation of fraud utterly fails to meet the specificity requirements of Rule 9(b). *See Mills*, 12 F.3d at 1175; *Manning*, 1999 WL 782569, at *4. Lastly, the FAC fails to allege that RSA and RSA Holdings individually violated § 1962(c). *See DeFalco*, 244 F.3d at 306 ("The requirements of section 1962(c) must be established as to each individual defendant."); *Jones v. Nat'l Commc'n and Surveillance*

*Networks,* 409 F. Supp. 2d 456, 473 (S.D.N.Y. 2006) ("The duration, frequency, and substance of the purported racketeering activity are measured independently for each individual defendant."). Accordingly, plaintiffs' RICO claims against RSA are dismissed.

As to plaintiffs' request for leave to amend their complaint to correct the deficiencies in their claims against RSA, plaintiffs have failed to indicate what additional allegations, if any, they could assert to make out a proper RICO claim. In fact, at oral argument plaintiffs' counsel declared that there are no additional facts to allege. Accordingly, plaintiffs are denied leave to amend the complaint. *See Caputo*, 267 F.3d at 191.

## CONCLUSION

For the reasons set forth above, the motions of both Air Line Pilots Association, including Duane Woerth, and Retirement Systems of Alabama, including Retirement Systems of Alabama Holdings LLC, are granted, and plaintiffs' claims are dismissed in their entirety. Therefore, the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
        July 24, 2008

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge